*23-6485*
*United States of America v. Lefebvre*

# In the
# United States Court of Appeals
# for the Second Circuit

August Term 2023
Argued: June 12, 2024
Decided: September 26, 2024

No. 23-6485

UNITED STATES OF AMERICA
*Appellee*,

v.

VARIAN LEFEBVRE,
*Defendant-Appellant*.

Appeal from the United States District Court for the District of Vermont

Before: JACOBS, PÉREZ, AND KAHN, *Circuit Judges*.

On appeal from judgment of conviction of the United States District Court for the District of Vermont (Reiss, *J.*).

Defendant-Appellant Varian Lefebvre pled guilty to possession with intent to distribute heroin and fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and possession of a firearm after a prior felony conviction in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Lefebvre was arrested after Vermont State Police officers responded to a 911 call reporting an assault at a Holiday Inn in Rutland, Vermont. As he did in the district court, Lefebvre now contends that all physical evidence seized from his backpack after his arrest should have been suppressed. His principal argument is that because the officers transported him to the nearby Vermont State Police barracks to conduct a witness identification, his seizure at the Holiday Inn ripened from an investigative detention into a de facto arrest.

Because we agree with the district court that Lefebvre's seizure did not rise to the level of a de facto arrest, and because the seizure was nonetheless supported by probable cause, we affirm the judgment of the district court.

AFFIRMED.

---

BARCLAY T. JOHNSON, Assistant Federal Public Defender, District of Vermont, Burlington, VT.

GREGORY L. WAPLES (Kimberly G. Ang, *on the brief*), Assistant United States Attorneys, *for* Nikolas P. Kerest, United States Attorney for the District of Vermont, Burlington, VT.

_____

MYRNA PÉREZ, *Circuit Judge*:

Defendant-Appellant Varian Lefebvre pled guilty to possession with intent to distribute heroin and fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and possession of a firearm after a prior felony conviction in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Lefebvre's encounter with law enforcement began when officers from the Vermont State Police responded to a 911 call about an assault at a Holiday Inn in Rutland, Vermont. The responding officers located Lefebvre at the hotel and transported him to the nearby Vermont State Police barracks for identification by the purported victims, where he was then arrested. As he did in the district court, Lefebvre now contends that all physical evidence

seized from his backpack after his arrest should have been suppressed. His principal argument is that when the officers transported him to the police barracks, his seizure ripened from an investigative detention pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), into a de facto arrest unsupported by probable cause. Because we agree with the district court that Lefebvre's seizure did not rise to the level of a de facto arrest, and because the seizure was nonetheless supported by probable cause, we affirm the judgment of the district court.

## BACKGROUND

On the morning of January 21, 2021, an employee at the Holiday Inn in Rutland, Vermont called 911 and reported that a man "wearing a gray sweatshirt and jeans with tattoos on his face had threatened two female guests with a gun" in a stairwell at the hotel. J. App'x at 188. Vermont State Police Trooper Jeremy Sullivan was the first officer to respond to the 911 call, arriving at the hotel at approximately 8:59 a.m.[1] Upon arriving at the hotel, Trooper Sullivan spoke with two women who purported to be the victims of the alleged assault. Their description of the assailant and of the assault itself largely matched the

---

[1] Several days earlier, on January 17, 2021, Trooper Sullivan had in fact received a tip from an FBI agent about a man in the area who had been selling heroin and threatening people with a weapon. For reasons discussed *infra*, this tip is not probative for purposes of our probable cause analysis; however, it is useful context for understanding the events that followed.

3

descriptions provided in the 911 dispatch. Shortly thereafter, Vermont State Police Sergeants Blake Cushing and Doug Norton arrived at the hotel, and the officers instructed the two women to leave the hotel and wait at the nearby Vermont State Police barracks for their safety. After the two women left, the officers conducted a search of the hotel, during which they spoke with a third hotel guest, who stated that she had overheard the encounter and affirmed that she had previously seen a man with facial tattoos use the stairwell in question.

After searching the hotel common areas, Trooper Sullivan drove his patrol car to the rear parking lot of the hotel, where he observed Lefebvre leaving the stairwell where the assault had allegedly taken place. Trooper Sullivan described Lefebvre as "wearing a grey hoodie sweatshirt, a blue-colored medical face covering, had several face tattoos visible, and was carrying a backpack over his shoulder(s)." J. App'x at 36. Trooper Sullivan stated that, "as [Lefebvre] looked towards [him] and [his] cruiser, . . . [Lefebvre] appeared to jump or startle" and "quickly turned his back towards me and began looking at his phone." *Id.* at 36–37. Trooper Sullivan then stepped out of his patrol car, drew his weapon, and ordered Lefebvre to stop and show his hands. Trooper Sullivan conducted a pat-down search, and, with the assistance of the other officers, handcuffed Lefebvre.

4

Lefebvre denied permission to search his backpack. Trooper Sullivan then placed Lefebvre in the back of his patrol car and drove him to the police barracks so the two witnesses could confirm his identity. The drive took approximately nine minutes.

At the police barracks, the witnesses confirmed Lefebvre was the man who had pointed the gun at them, and Lefebvre was arrested for aggravated assault. Trooper Sullivan obtained a warrant to search the backpack, in which he found a handgun, .40 caliber cartridges, 220 bags of fentanyl, and a bag of marijuana.

Lefebvre ultimately entered a conditional guilty plea to possession with intent to distribute heroin and fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and possession of a firearm after a prior felony conviction in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The district court sentenced Lefebvre to a 77-month term of imprisonment to run concurrently with any other state court sentence imposed, followed by a seven-year term of supervised release. The judgment was entered on May 1, 2023. Pursuant to his conditional guilty plea, Lefebvre now challenges only the district court's denial, in a November 29, 2021, order, of his motion to suppress the physical evidence seized from the backpack.

## STANDARD OF REVIEW

On appeal from the denial of a suppression motion, "we review factual determinations for clear error, but we review de novo conclusions of law . . . including the ultimate determination of 'whether the admitted or established facts satisfy the relevant statutory or constitutional standard.'" *United States v. Fiseku*, 915 F.3d 863, 869 (2d Cir. 2018) (quoting *United States v. Alexander*, 888 F.3d 628, 631 (2d Cir. 2018)).

## DISCUSSION

We affirm the judgment of the district court. Lefebvre's seizure did not rise to the level of a de facto arrest because the level of force and degree of intrusion asserted at each step, including the transportation to the police barracks, was reasonable given the circumstances. Even assuming the seizure was a de facto arrest, it was supported by probable cause.

**I.   The officers' seizure and transportation of Lefebvre to the state police barracks was a reasonable investigative detention**

The district court concluded that Lefebvre's seizure and subsequent transportation to the Vermont State Police barracks was properly viewed as an investigative stop under *Terry*. We have explained that "[t]here are no hard and fast rules for evaluating the conduct of law enforcement agents conducting

6

investigative stops." *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990). "For an investigatory stop to be conducted in an 'appropriate manner,' the stop must be 'limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place[.]'" *United States v. Patterson*, 25 F.4th 123, 140 (2d Cir. 2022) (first quoting *Terry*, 392 U.S. at 22; and then quoting *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017)). In determining whether the level of force and degree of intrusion used was reasonable, we look to a variety of factors, including "(1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004). "No one of these factors is determinative." *Id.* "But to satisfy the reasonableness standard" for a *Terry* stop, the "officers . . . must employ 'the least intrusive means reasonably available' to effect their legitimate investigative purposes." *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)).

Lefebvre contends that, at some point before or during his transportation to the police barracks, his seizure ripened into a de facto arrest. There were several

7

factors present during the seizure that, in many situations, this Court would consider to be evidence that a seizure had indeed become a de facto arrest. Lefebvre's "freedom of movement was restrained" and "handcuffs were used." *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)). Trooper Sullivan drew his firearm and pointed it at Lefebvre. *See Fiseku*, 915 F.3d at 870 (considering the "display or use of physical force against the person stopped, including firearms" (quoting *Newton*, 369 F.3d at 674)). And the encounter lasted roughly 20 minutes. *See id.*

However, the touchstone of a de facto arrest analysis is whether the officers conducting the stop used "the least intrusive means reasonably available to effect their legitimate investigative purposes." *Id.* (citation omitted). While many of the steps the officers took involved shows of force often associated with an arrest, we cannot say that any of these steps exceeded "the degree of intrusion necessary to confirm or dispel" the officers' reasonable suspicion. *Patterson*, 25 F.4th at 140 (citation omitted).

Lefebvre primarily contends that transporting him to the police barracks for identification by the witnesses was an unreasonable or dilatory investigative step. We reject this contention.

8

Officers may in some situations transport a suspect to a different location for questioning without effectuating a de facto arrest; however, most cases concluding as such involved transportation of a much shorter distance than the several miles between the Holiday Inn in Rutland and the Vermont State Police barracks. *See, e.g., United States v. McCargo*, 464 F.3d 192, 197–99 (2d Cir. 2006) (holding that transporting a suspect a few blocks in a patrol car was reasonable); *Tehrani*, 49 F.3d at 56, 61–62 (holding that transporting suspects at an airport to a separate office within that airport was reasonable).

Given the particular circumstances of this seizure, transporting Lefebvre to the police barracks was a reasonable way to confirm or dispel the officers' suspicion. As referenced above, before encountering Lefebvre, Trooper Sullivan had already sent the witnesses to wait at the police barracks for their own safety— a reasonable directive, given that the officers were actively searching the hotel for a potentially armed suspect. No other officers were present at the police barracks because only three officers were on duty that day. Contacting the witnesses and asking them to return to the hotel would have taken at least as long as taking Lefebvre to the police barracks, if not longer.

9

Lefebvre's transportation to a police station, instead of some other reasonable third location, would in many situations clearly establish that the seizure had ripened into a de facto arrest. *See*, *e.g.*, *Smith v. Heap*, 31 F.4th 905, 911 (5th Cir. 2022). However, bringing Lefebvre directly to the police barracks instead was, in this specific situation, arguably the least "dilatory" means for the officers to confirm or dispel their suspicions. *See, e.g.*, *Tehrani*, 49 F.3d at 61 (explaining that a longer *Terry* stop may be permissible where officers are "diligently" pursuing their investigation (citation omitted)); *Fiseku*, 915 F.3d at 873 (stating that officers must not be "dilatory in questioning" during a *Terry* investigative stop (citation omitted)).

## II. Even assuming the seizure of Lefebvre was a de facto arrest, it was supported by probable cause

"Probable cause to arrest requires that the totality of facts and circumstances known to the police permit a person of reasonable caution to conclude that there is a 'fair probability' that the person to be seized has committed or is committing a crime." *Patterson*, 25 F.4th at 136 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citations

10

omitted). However, "when [the victim's or witness's] description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist." *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007).

Trooper Sullivan relied on a long list of factors in deciding to detain Lefebvre, including the 911 call, his conversation with the hotel employee after he arrived at the hotel, his conversation with the two complaining witnesses, his conversation with the third hotel guest who overheard the incident, Lefebvre's presence leaving the stairwell where the incident allegedly occurred, and Lefebvre's startled reaction upon seeing the police car. While the 911 call itself would be insufficient for probable cause because a 911 dispatcher's knowledge cannot necessarily be imputed to an arresting officer, *see United States v. Colon*, 250 F.3d 130, 137 (2d Cir. 2001), Trooper Sullivan's "prompt confirmation of the report in an in-person interview of the victim was so imputable," *Patterson*, 25 F.4th at 137.

But more importantly, the two witnesses and the third hotel guest provided similar descriptions of Lefebvre and confirmed the incident occurred in the particular stairwell that Trooper Sullivan observed Lefebvre leaving.

11

Identification of a suspect who "not only fit the description [provided by witnesses] but was observed [leaving] the very . . . [area] in which" the alleged crime took place constitutes strong evidence of probable cause. *United States v. Moreno*, 701 F.3d 64, 74 (2d Cir. 2012).

Witness and putative victim statements such as these are distinguishable from less probative examples of probable cause evidence such as the FBI tip Trooper Sullivan received several days before the 911 call, which had merely described a "Hispanic male . . . 5'5 feet tall and approximately 130 pounds, from the Massachusetts area . . . in possession of a firearm." J. App'x at 93. This description is vague and "would fit a very large group of ordinary young men," *United States v. Rosario*, 543 F.2d 6, 8 (2d Cir. 1976), and we assign it little to no value for our probable cause analysis.

Finally, the alleged inconsistencies between the witnesses' descriptions and Lefebvre's actual appearance are trivial and easily reconcilable. For example, the complaining witnesses described Lefebvre as wearing a "grey sweatshirt," J. App'x at 52, and Trooper Sullivan described him as wearing a "grey hoodie sweatshirt," *id.* at 36. Lefebvre contends that his hoodie sweatshirt was actually green. This distinction is trivial in the instant case—it is clear from the photos in

12

Trooper Sullivan's search warrant affidavit that Lefebvre was wearing a gray fleece that was zipped over a green hoodie sweatshirt. *See id*. at 39.

## CONCLUSION

We hold that Lefebvre's seizure did not become a de facto arrest when he was transported to the Vermont State Police barracks because the transportation was a reasonable and non-dilatory investigative step given the unique circumstances. And even assuming the transportation did rise to the level of an arrest, we find that it was supported by probable cause. For these reasons, we **AFFIRM** the judgment of the district court.